UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:                                                  Case No. 16-14989-RBR

OLEG LUKOV,                                             Chapter 7

       Debtor.
_____/
ELLA BURBACKI, Creditor

       Plaintiff,

vs.                                                     Adv. Proc. No.: _____

OLEG LUKOV,

       Defendant.
_____/

**COMPLAINT OBJECTING TO**
**DISCHARGE AND DISCHARGEABILITY OF CERTAIN DEBTS**

Plaintiff, Ella Burbacki (the "Creditor"), Chapter 7 Creditor of the bankruptcy estate of Oleg Lukov by and through undersigned counsel, hereby sues the Defendant, Oleg Lukov, (hereinafter the "Debtor" or "Defendant") pursuant to 11 U.S.C. §523 and 11 U.S.C §727, and alleges:

**JURISDICTION, VENUE, AND PARTIES**

1.    This is an adversary proceeding brought by the Creditor to determine the dischargeability of debts owed by the Defendant to Plaintiff pursuant 11 U.S.C. §523(a)(2), (3), (4) and (6), and objecting to discharge of the Debtor pursuant to 11 U.S.C. § 727.

2.    The Defendant commenced his underlying bankruptcy case filing a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on April 6, 2016.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).

4.      This is a core proceeding for which the Court is authorized to hear and determine all matters regarding this case in accordance with 28 U.S.C. §§ 157(b)(2)(J).

5.      Venue of this proceeding is properly before this Court pursuant to 28 U.S.C. § 1409.

6.      Creditor, Ella Burbacki, is a resident of the State of New York, and is the Debtor's first-cousin.

7.      Ms. Burbacki is a Creditor in these proceedings by virtue of a $1.3 million Final Judgment issued in her favor against Debtor, Oleg Lukov, by the State of New York, arising from the Debtor's fraudulent conduct in certain business relations with Ms. Burbacki ("Burbacki Judgment").   A copy of the Burbacki Judgment is attached hereto as **Exhibit "A"** and is incorporated herein. The Burbacki Judgment is final and non-appealable. As of the date hereof, this amount, plus post-judgment interest, fees and costs, remains unpaid.

8.      The Burbacki Judgment has been domesticated in the State of Florida. *See Miami-Dade Circuit Court Case No. 14-25048-CA-10.*  Ms. Burbacki objects to the dischargeability of this debt under 11 U.S.C §523.

9.      Ms. Burbacki further objects to discharge of the Debtor pursuant to 11 U.S.C. § 727. The Debtor, in connection with these proceedings and his immediately preceding Chapter 13 proceedings, has concealed property, made a false oath or account, and failed to explain satisfactorily any loss of assets or deficiency of assets to meet the debtor's liabilities.

10.     Ms. Burbacki is the sole party pursuing a 727 action because the Trustee has settled his claims with the Debtor, and is not objecting to discharge.

2

11.     This lawsuit has been brought timely as Ms. Burbacki's deadline to file same is July 13, 2017.  (ECF No. 133).

12.     All conditions precedent to bringing this action have occurred, have been performed, are futile, or have been waived.

## GENERAL ALLEGATIONS

### A.  Parties' Business Relationship and the Burbacki's Judgment

13.     In and around 2003/2004, Lukov approached Plaintiff-Creditor, Ella Burbacki, and Olga Gorelik, with a request to collaborate on a joint business venture under the name Sullivan County Development Group, LLC ("SCDG")[1], a New York State Limited Liability Company which was created for the purpose of buying, developing, and selling properties in Sullivan County, New York.

14.     The Defendant convinced the Creditor that SCDG would be highly successful and prosperous business venture which would exponentially increase the value of Burbacki's contributions to SCDG.

15.     Defendant, Burbacki, and Gorelik had an understanding that each would have a 1/3 interest in SCDG, and in any profits and proceeds that the company would bring in. Instead and contrary to his representations, the Debtor maintained and exercised full control of SCDG, handled most, if not all, of the company's business transactions, had access and control of company accounts, and received a direct benefit from the company.

16.     Lukov represented to Burbacki that SCDG properties would be managed for the benefit of SCDG, and that SCDG proceeds would be used toward SCDG debts, or reinvestment into additional SCDG properties, or equal disbursement to SCDG members.

---

[1] SCDG is no longer operating.

17.     In reliance on Lukov's representations:

a.   the Creditor, the Defendant and Gorelik formed SCDG to purchase, develop and sell certain real property; and

b.   Burbacki directly or indirectly contributed money to SCDG, and personally guaranteed mortgage(s) on behalf of SCDG.

18.     The Debtor represented to the Creditor that she would be informed of major decisions for SCDG and have input on same.

19.     Despite his representations to Burbacki about how the properties will be managed and how SCDG proceeds will be used, Lukov used SCDG as his own personal piggy bank. Lukov engaged in the practice of: selling properties without notice to Burbacki and without depositing SCDG monies into corporate accounts; and using SCDG monies for personal use and without properly disbursing the proceeds between the 3 SCDG members. Lukov also failed to reinvest proceeds back into SCDG and failed to properly pay SCDG debts.

20.     As detailed herein, the Defendant's intention from the beginning was to defraud the Creditor by using her capital and credit to purchase properties and reap the benefits thereof for his own benefit while leaving the Plaintiff with any and all liability associated therewith.

21.     As a result of this fraudulent conduct, Burbacki did not receive her 1/3 of the proceeds for the sale of the following SCDG properties, as an example and without limitation:

a.   330 Old Tracy Road, Kauneonga NY (12-1-7.12);

b.   338 Old Tracy Road, Bethel, NY  (12-1-7.13);

c.   (unaddressed) Old Tracy Road Kauneonga Lake, NY (12-1-7.11);

d.   Horseshoe Lake Property;

e.   Property that SCDG sold and/or gifted to R. Brothers Upstate Development LLC, an entity which may have been owned by Defendants and/or his affiliates.

4

22.     The Defendant sold several other Sullivan County Properties without the Plaintiff's knowledge or consent and never disbursed the proceeds to the Plaintiff or deposited the funds in SCDG's account.

23.     In addition, due to Lukov's depletion of corporate account and/or other siphoning of funds, and/or other misconduct, SCDG did not pay the mortgage on the property located at 37 John Bishop Road, Bethel NY (17-1-17.1), causing Ella to pay the mortgage, and incurring personal liability as guarantor in the foreclosure proceedings.

24.     Lukov also asked Burbacki to open a credit card, using her credit, for the use and benefit of SCDG ("SCDG Credit Card").  He represented that the credit card would be paid with SCDG funds.

25.     In reliance on Lukov's representations, Burbacki opened an American Express card for SCDG use. During the time that the parties were involved with SCDG, Lukov used the SCDG Credit Card for personal expenses, incurring charges in the amount of $94,110.49. Lukov never paid for the charges on SCDG Credit Card, causing Burbacki to incur personal liability for the charges.  Lukov acknowledged that he owed this debt and represented he would pay, but he did not intend to and this was one of many fraudulent representations.  Lukov's promise to pay is attached hereto as **Exhibit "B."**

26.     From the inception of SCDG, the Defendant exercised complete dominion and control over SCDG, including its assets, bank accounts and corporate formation documents, despite the Parties' agreement that the Plaintiff would be included in any major decisions on behalf of SCDG.

27.     The Defendant improperly utilizing unfettered access to SCDG's funds and took advantage of the Plaintiff's trust.  Further, the Defendant deceptively and improperly managed the development and sale of the Sullivan County Properties for his own benefit.

28.     As a result of the above-referenced fraud, Burbacki sued Lukov and obtained a Final Judgment against him in the State of New York for approximately $1.2 million. As of the date hereof, this amount, plus post-judgment interest, fees and costs, remains unpaid. The filing of this Complaint, the Burbacki Judgement has been domesticated in the State of Florida.

29.     Notably, Lukov was indicted and sentenced in 2008 by the federal authorities for his fraudulent acts relating to SCDG and the properties that he sold.

**B.  Lukov's Florida Business (LukFuel)**

30.     In 2014, Ella Burbacki sought to execute on her judgment, with a focus on Lukov's main asset in Florida –Lukfuel, LLC – a fuel company held in the name of Lukov's daughter, Monique Lukov a/k/a Monique Itskowitz.

31.     Debtor had extensive experience in the business of fuel, but was unable or unwilling to open the business in his name. Debtor owned and operated fuel transportation companies under the alias "Alex Lukov" in New York and New Jersey.  Those companies were part of a Russian Organized Crime outfit called the "Lukov Organization" which operated under the protection of the Luchese Organized Crime Family.  *See* https://groups.google.com/forum/#!topic/soc.culture.ukrainian/8UINV0S2Eh0 (citing now-dead link at http://www.usdoj.gov/usao/nye/pr/2001may29.htm).  In the year 2000, he was indicted and charged by the United States of America with various wire fraud, mail fraud, extortion, conspiracy, RICO, money laundering, and assault in aid of racketeering arising out of the Debtor's illegal fuel transportation companies and enterprises in Case No. 1:00-cr-01197-SJ in

the United States District Court for the Eastern District of New York (the "Criminal Case"). This criminal enterprise was known as the "Lukov Organization."

32.     While on probation for these crimes, the Debtor engaged in various acts of mortgage and bank fraud which violated that probation.  As a result, on December 19, 2008, the Debtor was sentenced to a total of 34 months in federal prison (10 month for the mortgage/bank fraud, and 24 months for the original RICO charges, to be served consecutively).  The Debtor reported to federal prison on January 5, 2009 [ECF 184 in the Criminal Case].  The $20,772,500 restitution judgment remained valid and unpaid, then and as of today.

33.     The mortgage/bank fraud for which Debtor served time relates to the Debtor's conduct underlying the Burbacki Judgment.

34.     As his release was approaching, Oleg Lukov, through his 24-year old daughter Monique Lukov, and her then-husband Barry Itzkowitz opened Lukfuel in October 7, 2011. When Lukfuel was opened in 2011, the owners of record were Monique Lukov, Barry Itzkowitz, and Barry's father, Boris Itskowitz.

35.     Monique Lukov has no education past high school and at the time Lukfuel was opened, and for a number of years thereafter, worked in high-end retail clothing boutiques. Her then-husband, Barry Itzkowitz was a commodities trader in New York, and likewise had no experience in the fuel business. Boris Itzkowitz operated a plumbing supply business in New York.

36.     Oleg Lukov purposefully and fraudulently opened Lukfuel in the name of his daughter in order to shield his assets from the federal government and its approximately $20,000,000 judgment stemming from the Criminal Case, and to shield his assets from Burbacki who holds a $1.2 million judgment against Lukov.

7

37.     Additionally, the Debtor also engaged in this subterfuge to shield Lukfuel's income and assets from Ella Burbacki and Olga Gorelik who had sued the Debtor in 2008 for millions arising out his bank and mortgage fraud schemes, and who ultimately received judgments against him for $1,175,288.90 on August 5, 2014 (Ella Burbacki) and for $1,352,092.04 on July 23, 2014 (Olga Gorelik) [Claim Nos. 5 and 6].

38.     However, at all times, Debtor was the true and sole owner of Lukfuel, and controlled and operated Lukfuel in all ways.  He participated in the daily operations of the company, and the revenues and income of Lukfuel were used to support the financially lavish lifestyle of the Debtor, and his family. For instances, Lukfuel itself pays the rent on a $8,000 per month large, waterfront house in Boca Raton, referred to as the "Lukov Estate," where the Debtor's wife, minor son, his younger daughter Ariel, and Monique Lukov and her minor son live lavishly with no ostensible source of income.  The Debtor maintains a separate residence in a rented Miami Beach high-rise on Collins Avenue to be near Lukfuel where he works daily. Lukfuel accomplishes this ruse by expending tens of thousands of month in supposed cash transactions with no back-up or receipts, and by various family members using ATM cards of Lukfuel's bank accounts to pay for their living expenses, and by using Lukfuel's credit cards for personal expenses, and items unrelated to its business.  Monique Lukov receives a salary from Lukfuel as does the Debtor's 17-year old son.

39.     The Debtor has consistently operated businesses which were not held in his name – including two (2) Russian restaurants in Sunny Isles Beach, Florida – from which he received distribution, income, or other direct or indirect benefits, without disclosing his true ownership or involvement in the businesses.

8

40.     Rather, the Debtor uses his family members as straw-principals to shield his assets from his creditors. For example, on or about April 17, 2013, Lukfuel's landlord sued it for eviction with the Debtor named as a defendant as the "Tenant."  A copy of that complaint is attached as **Exhibit "C."**  The Debtor also personally operated and managed Lukfuel's website and Internet presence, personally responding to inquiries and Internet reviews of his business as its sole owner.  Attached as **Exhibit "D"** is a printout of the website materials.  The Debtor is present every day at its place of business and handles and directs all business.

41.     On or about October 22, 2013, Monique Lukov and Barry Itzkowitz decided to end their marriage, which triggered Barry Itzkowitz and Boris Itzkowitz wishing to end their status as straw principals of Lukfuel. As a result, Lukfuel, Barry Itzkowitz, and Boris Itzkowitz entered into a Lukfuel LLC Member Redemption, Non-Compete, and Non-Disclosure Agreement (the "Lukfuel Agreement"), pursuant to which their 50% collective interest was sold back to Lukfuel for $250,000. Neither Barry Itzkowitz nor Boris Itzkowitz had contributed anything to Lukfuel for these alleged ownership interests in cash, capital or otherwise, that would obligate Lukfuel to them anywhere near $250,000.  Their purported ownership interest was a fiction to evade the Debtor's creditors and to permit Lukfuel to obtain necessary licenses, security clearances, and trade credit that the Debtor's public association or ownership of Lukfuel would prohibit.

42.     On or about January 14, 2014, Lukfuel purported to sell 51% of its shares to Defendants Roger Moore and Jeff Garcia, who paid Lukfuel $164,300 for those shares.

43.     Despite claiming to be Lukfuel's founder, 49% owner and sole operator, Monique Lukov cannot explain anything about various transactions pertaining to Lukfuel (including circumstances of how the company was started) and likewise cannot explain basic business

9

transactions set forth in the books and records of Lukfuel that she claims to negotiated and handled.

44.     Further, the Debtor as the true owner of Lukfuel has failed to explain the liquidation of certain assets.

45.     The Debtor, on the other hand, despite claiming he has no interest in Lukfuel, has been named in eviction proceedings with Lukfuel; has been identified as the contact person by Lukfuel in response to online complaints; and has been identified by Lukfuel's former landlord as the person running the company – the same landlord who never heard of Monique Lukov.  See attached transcript as **Exhibit "E."**

### C.  Lukov's Bankruptcies and Fraudulent Representations and Conduct

46.     In June 23, 2015, Lukov filed for Chapter 13 Bankruptcy (case no. 15-21320), and failed to disclose the value of Burbacki's Judgment (likely because it would have prevented a Chapter 13 filing as exceeding the jurisdictional limit for unsecured debts).

47.     Lukov's Ch. 13 petition and schedules revealed that:

    a.  His monthly income was $2,000, working for Nautical Ventures (but he failed to disclose that Nautical Ventures owns 51% Lukfuel);

    b.  That there was 3 people in his household (of which he was head of family as previously stated just months earlier under oath in Form 1.977);

    c.  His wife was unemployed; and

    d.  The rent for his home is $7,000.

48.     When the clear and fraudulent discrepancy in his income came under scrutiny, Lukov, for the first time, presented 2 affidavits (the "Daughters' Affidavits")[2] from his daughters that they contribute monthly to his living expense in the amount of $7,500, even though there are

_____

[2] Copies of the Daughters' Affidavits are attached hereto as **Composite Exhibit "F"**.

10

checks written by Lukov to his daughter wherein he pays **their** monthly expenses.  However, both daughters worked in retail, and no evidence, apart from affidavits, was submitted demonstrating their support.

49.     Furthermore, at his Chapter 13 creditor's meeting, Lukov could not explain why he was named as a Defendant in an eviction case against Lukfuel by Landlord, Northeast 17th Avenue Corp., even though that Landlord clearly identified Debtor as operating the company.

50.     Burbacki successfully sought the dismissal of the Chapter 13 proceedings.

51.     Mere months after dismissal of the Chapter 13 case, on April 6, 2017, the Defendant commenced his underlying bankruptcy case by filing a voluntary Chapter 7 Petition in the Southern District of Florida Bankruptcy Court (Case No. 16-14989-RBR) (the "Lukov Ch. 7 Bankruptcy Case").

52.     In the Lukov Ch. 7 Bankruptcy Case, Debtor maintains that he is not affiliated or associated with Lukfuel and that he doesn't receive a direct benefit from the company.

53.     Among other false sworn statements made by the Debtor:

    a.  That the Debtor does not have any interests in any company, including without limitation, LukFuel (ECF No. 1 at p. 12);

    b.  Debtor does not receive any income (ECF no. 1 at p. 33) even though a prior affidavit states that his daughters provide Oleg with regular support; and

    c.  The Debtor did not have any connection to a business (ECF No. 1 at p. 44).

54.     Debtor made other numerous inaccurate sworn statements during the 341 meeting and Rule 2004 Exams in connection with the bankruptcy cases.

55.     Debtor incorporates herein all of the allegations in the Trustee's complaint 16-14989-RBR (ECF No. 94).

56.     By keeping Lukfuel out of his name the Debtor concealed assets which are property of the estate and made numerous fraudulent transfers of property.

57.     During the course of the Chapter 13 and 7 bankruptcies, Debtor, through his daughter and other family members, continued to expand his business interests by opening other companies affiliated with Lukfuel – Lukfuel Generator Division, LLC and Lukfuel Polishing Solution, LLC.

**COUNT I – NONDISCHARGEABILITY**
**PURSUANT TO 11 U.S.C.§523(a)(2)(A)-(B)**

58.     The Plaintiff incorporates the allegations contained in Paragraphs 1 to 57 of this Complaint as if set forth herein.

59.     11 U.S.C. §523(a)(2)(A)-(B) provides a debt is not discharged if it is:

(2)     for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A)     false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B)     use of a statement in writing—
        (i) that is materially false;
        (ii) respecting the debtor's or an insider's financial condition;
        (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
        (iv) that the debtor caused to be made or published with intent to deceive;

60.     Pursuant to 11 U.S.C. §523(a)(2)(A)-(B), a debt incurred by a debtor for money or property by actual fraud, false pretenses or a false representation is excepted from discharge.

61.     The Defendant obtained the money and property of the Plaintiff and SCDG through, without limitation, the following acts of fraud, false pretenses and/or false representations:

12

    a.   Depleting funds and/or property provided by Burbacki through transfers and payments to the Defendant or affiliates of the Defendant;

    b.   conveyances of certain Sullivan County, NY properties to affiliates or insiders of the Defendant without the Plaintiff's knowledge or consent;

    c.   sale of certain Sullivan County Properties without the Plaintiff's knowledge or consent;

    d.   embezzlement of SDCG funds;

    e.   disbursement of funds from SDCG and/or from the sale of the Sullivan County properties to the Defendant without an equivalent disbursement to the Plaintiff; and

    f.   failing to pay or requiring SCDG to pay the SCDG Credit Card.

62.    Further, Debtor used funds fraudulently and with intent to defraud.

63.    As a direct and proximate result of the foregoing the Plaintiff has suffered damages in the amount set forth in the Final Judgment plus post-judgment fees, costs and interest.

WHEREFORE, the Plaintiff requests the Court enter judgment denying dischargeability of the Defendant's debt to the Plaintiff and granting such further relief as is deemed just and proper.

## COUNT II – NONDISCHARGEABILITY
## PURSUANT TO 11 U.S.C.§523(a)(4)

64.    The Plaintiff incorporates the allegations contained in Paragraphs 1 to 57 of this Complaint as if set forth herein.

65.    Pursuant 11 U.S.C. §523(a)(4),3 a debt incurred for fraud or defalcation while acting in a fiduciary capacity or incurred through embezzlement is excepted from discharge. See

---

[3] 11 U.S.C. § 523(a)(4) provides that a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny is not discharged.

66.     Pursuant to the SDCG Operating Agreement and the 2006 Agreement, the Defendant became the Plaintiff's business partner and fiduciary.

67.     The Defendant owed the Plaintiff fiduciary duties in connection therewith.

68.     The Defendant committed fraud and defalcation while serving in his fiduciary capacity including:

  a.  Depleting funds and/or property provided by Burbacki through transfers and payments to the Defendant or affiliates of the Defendant;

  b.  conveyances of certain Sullivan County, NY properties to affiliates or insiders of the Defendant without the Plaintiff's knowledge or consent;

  c.  sale of certain Sullivan County Properties without the Plaintiff's knowledge or consent;

  d.  embezzlement of SDCG funds;

  e.  disbursement of funds from SDCG and/or from the sale of the Sullivan County properties to the Defendant without an equivalent disbursement to the Plaintiff; and

  f.  failing to pay or requiring SCDG to pay the SCDG Credit Card.

69.     As a direct and proximate result of the foregoing the Plaintiff has suffered damages in the amount set forth in the Final Judgment plus post-judgment fees, costs and interest.

WHEREFORE, the Plaintiff requests the Court enter judgment denying dischargeability of the Defendant's debt to the Plaintiff and granting such further relief as is deemed just and proper.

## COUNT III – NONDISCHARGEABILITY
## PURSUANT TO 11 U.S.C.§523(a)(6)

70.     Plaintiff incorporates the allegations contained in Paragraphs 1 to 57 of this Complaint as if set forth herein.

71.     Pursuant to 11 U.S.C. §523(a)(6), a debt incurred for willful and malicious injury by the debtor to another entity or to the property of another is excepted from discharge.

72.     The Defendant engaged in the following willful and malicious acts, among others, with respect to the Plaintiff:

    a.  The wrongful conversion of Creditor's contributions, property, and distributions;

    b.  The wrongful disbursement of the funds of SCDG;

    c.  The wrongful transfer of the assets of SCDG

    d.  The wrongful conveyances of the Sullivan County properties; and

    e.  The embezzlement of funds.

73.     As a direct and proximate result of the foregoing the Plaintiff has suffered damages in the amount set forth in the Final Judgment plus post-judgment fees, costs and interest.

WHEREFORE, the Plaintiff requests the Court enter judgment denying dischargeability of the Defendant's debt to the Plaintiff and granting such further relief as is deemed just and proper.

## COUNT IV – DENIAL OF DISCHARGE
## PURSUANT TO 11 U.S.C.§727(a)(4)

74.     The Plaintiff incorporates the allegations contained in Paragraphs 1 to 57 of this Complaint as if set forth herein.

75.     11 U.S.C. 727(a)(4) provides:

(a)The court shall grant the debtor a discharge, unless—

15

(4) the debtor knowingly and fraudulently, in or in connection with the case—
(A) made a false oath or account…
(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs

76.     Debtor's Schedules, Section 341 Testimony, and Rule 2004 Testimony were all made under oath.. Yet, they are inconsistent, contradictory and incomplete.

77.     Specifically, Debtor denies owning any interest or involvement with any companies, yet the testimony of other individuals and other evidence reflects that the Debtor is actively involved with LukFuel and other ventures involving his family and that such ventures benefit the Debtor.

78.     Debtor's schedules and testimony concealed, among other things, the Debtor's interest in LukFuel and the benefits Debtor receives from same.  Debtor's purpose in omitting this information was to prevent the Trustee from recovering assets and distributing the same to Debtor's creditors and Debtor did so with a fraudulent intent.

79.     The Debtor has failed to produce documents relating to the Debtor's ownership interest and involvement in LukFuel.  Further, Debtor has failed to provide documents which disclose how the Debtor disposed of the funds from SDCG.  Other documents have been withheld from the Trustee as well.

80.     Accordingly, the Debtor has made a false oath in Debtor's schedules, 341 meeting, and the 2004 Examination.  Additionally, the Debtor has withheld information and documents relating to the Debtor's property and financial affairs.

81.     The discharge of Oleg Lukov, should be denied pursuant to 11 U.S.C. § 727(a)(4) as a result of his actions.

16

WHEREFORE, the Creditor, by and through undersigned counsel, respectfully requests that this Court enter judgment denying the discharge of Oleg Lukov, plus grant such other and further relief as this Court deems just and proper.

## COUNT V – DENIAL OF DISCHARGE
## PURSUANT TO 11 U.S.C.§727(a)(2)(A)-(B)

82.     The Plaintiff incorporates the allegations contained in Paragraphs 1 to 57 of this Complaint as if set forth herein.

83.     Pursuant to 11 U.S.C. § 727(a)(2)(A)&(B), the Court shall grant a debtor a discharge, unless:

> "The debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this Title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed
>
> (A) property of the debtor, within one year before the date of the filing of the petition…
> (B) property of the estate, after the date of the filing of the petition;

84.     The Debtor has transferred and/or concealed hundreds of thousands of dollars as evidenced by, among other things, the transfers from LukFuel to Debtor's relatives or to cash which funded the Debtor's lifestyle, within one year before the date of the filing of the petition, all with the intent to hinder delay and defraud his creditors.

85.     Further, Debtor concealed his interest in LukFuel and other related entities within one year before the date of the filing of the petition, all with the intent to hinder delay and defraud his creditors.

86.     Post-petition, the Debtor has concealed receipt of transfers from LukFuel which is property of the estate.  Debtor has refused to turnover the estate property to the Trustee.

87.     Oleg Lukov's discharge should be denied as a result of these transfers, concealments, mutilations, and/or destructions, pursuant to 11 U.S.C. § 727(a)(2)(A)-(B).

WHEREFORE, the Creditor, by and through undersigned counsel, respectfully requests that this Court enter judgment denying the discharge of Oleg Lukov, plus grant such other and further relief as this Court deems just and proper.

## COUNT VI – DENIAL OF DISCHARGE
## PURSUANT TO 11 U.S.C.§727(a)(5)

88.     The Plaintiff incorporates the allegations contained in Paragraphs 1 to 57 of this Complaint as if set forth herein.

89.     While the Plaintiff and Trustee have requested documentation from the Debtor, the documentation produced by the Debtor is inadequate. Moreover, as evidenced by the Debtor's own 341 and 2004 examination testimony, the Debtor has failed and/or refused to provide pertinent information regarding his financial affairs or such testimony is inconsistent with representations in Debtor's Schedules and SOFA.

90.     Accordingly, the Debtor has failed to explain satisfactorily, before determination of denial of discharge, any loss of assets or deficiency of assets to meet his liabilities.

91.     The Debtor admits to incurring substantial liabilities to unsecured creditors. However, the Debtor cannot demonstrate a loss of assets or deficiency of assets to meet these liabilities. It is clear that the Debtor has substantial unpaid liabilities which do not correspond with his assets that existed as of the date of filing bankruptcy.

92.     The discharge of Oleg Lukov, should be denied pursuant to 11 U.S.C. § 727(a)(5) as a result of his actions.

18

WHEREFORE, the Creditor, by and through undersigned counsel, respectfully requests that this Court enter judgment denying the discharge of Oleg Lukov, plus grant such other and further relief as this Court deems just and proper.

Respectfully submitted July 13, 2017.

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

POLLACK, POLLACK & KOGAN, LLC
*Attorneys for Creditor, Ella Burbacki*
44 West Flagler Street, Suite 2050
Miami, Florida 33130
Primary Email: luda.kogan@ppkfirm.com
Secondary Email:      diosi.perez@ppkfirm.com
Tel: (305) 373-9676
Fax: (305) 373-9679

By:      /s/ Lyudmila Kogan
         Lyudmila Kogan, Esq.
         Fla. Bar No. 69405

19

14-25048CA10

## Certification

**STATE OF NEW YORK, COUNTY OF KINGS, SS:**

**I, Nancy T. Sunshine, County Clerk and Clerk of Supreme Court Kings County,**

**do hereby certify that on August 20, 2014 I have compared**

**the document attached hereto,**

**18128/2008 Judgment filed 8/5/2014 page(s) 1-4.**

**with the originals filed in my office and the same is a correct transcript**

**therefrom and of the whole of such original in witness**

**whereto I have affixed my signature and seal.**

*Nancy T. Sunshine*

NANCY T. SUNSHINE
KINGS COUNTY CLERK

**EXHIBIT A**

18128/2008 Judgment

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------------X
OLGA GORELIK, individually, and                        Index No. 18128/2008
OLGA GORELIK on behalf of
SULLIVAN COUNTY DEVELOPMENT GROUP LLC,
                                        Plaintiffs,          **JUDGMENT AFTER INQUEST**

              -against-

ALEX LUKOV a/k/a ALEX LUKOVOS a/k/a OLEG,
ELLA BURBACKI, and R BROTHERS UPSTATE
DEVELOPMENT, LLC,
                                        Defendants.
-----------------------------------------------------------------------X

Cross-Claimant ELLA BURBACKI, having conducted an inquest before this Court, at

Part 82 thereof, on July 18, 2014, and the Court, following the inquest, having rendered a

decision awarding judgment to ELLA BURBACKI against defendant ALEX LUKOV a/k/a

ALEX LUKOVOS a/k/a OLEG for:

  a) $94,110.49 with statutory interest from February 5, 2008;

  b) $191,666.67 with statutory interest from October 28, 2005;

  c) $158,333.33 with statutory interest from December 30, 2005;

  d) $223,818.83 with statutory interest from April 6, 2006; and

  e) $8,525.00,

for a total judgment of $676,454.32, and statutory interest on the above amounts from the above-

referenced dates,

**NOW**, on motion of Jonathan E. Neuman, Esq., attorney for Cross-Claimant ELLA

BURBACKI,

**IT IS HEREBY ADJUDGED** that Cross-Claimant ELLA BURBACKI, living at 251

Beaumont Street, Brooklyn, New York 11235, recover from and have judgment against

defendant ALEX LUKOV a/k/a ALEX LUKOVOS a/k/a OLEG, whose last known address is

Printed: 8/20/2014

839 Cliffside Avenue, North Woodmere, New York 11581, in the amount of $676,454.32, plus

statutory interest on the above amounts through the date of entry of this judgment amounting to

$497,144.58, together with costs and disbursements as taxed by the Clerk in the sum of

1690.00

$2,290.00, making in all the sum of $1,175,888.90, and that Cross-Claimant ELLA BURBACKI

1,175,288.90

have execution therefor.

Judgment signed August 5, 2014

CLERK OF COURT

**NANCY T. SUNSHINE**
**Clerk**

FEE

KINGS COUNTY CLERK   2014 AUG -5  PM 4: 09   FILED

18128/2008 Judgment      Page 3 of 4

**Supreme Court**
**County of** Kings

| | |
|---|---|
| Olga Gorelik, et al. | **Index No.** |
| | 18128/2008 |
| *Plaintiff(s)* | |
| -against- | **Costs of:** |
| | Cross-Claimant |
| Alex Lukov a/k/a Alex Lukovos a/k/a Oleg, et al. | Ella Burbacki |
| *Defendant(s)* | |

## COSTS

| | |
|---|---|
| Costs Before Note of Issue CPLR § 8201 subd. 1 | $ 200 |
| Costs After Note of Issue CPLR § 8201 subd. 2 | $ 200 |
| Trial of Issue and Inquest CPLR § 8201 subd. 3 | $ 600 |
| Allowance by Statute CPLR § 8302 (a), (b) | $_____ |
| Additional Allowance CPLR § 8302 (d) | $_____ |
| Motion Costs CPLR § 8202 | $_____ |
| Appeal to Appellate Term CPLR § 8203 (b) | $_____ |
| Appeals to Appellate Division CPLR § 8203 (a) | $_____ |
| Appeals to Court of Appeals CPLR § 8204 | $_____ |
| Costs upon Frivolous Claims And Counterclaims CPLR § 8303-a | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |

Costs at $ 1690 00
This 5 day of August 2014
Clerk of Court Kings County
NANCY T. SUNSHINE Clerk

| | |
|---|---|
| Costs $ 1000 | |
| Disbursements $ | 690 00 |
| Total $ | 1690.00 |

## DISBURSEMENTS

| | |
|---|---|
| Fee for Index Number CPLR § 8018 (a) | $_____ |
| Referee's Fees CPLR § 8301 (a)(1), 8003(a) | $_____ |
| Commissioner's Compensation CPLR § 8301 (a)(2) | $_____ |
| Clerk's fee, Filing Notice of Pend. Or Attch. CPLR § 8021 (a)(10) | $_____ |
| Entering and Docketing Judgment CPLR § 8301 (a)(7), 8016(a)(2) | $_____ |
| Paid for Searches CPLR § 8301 (a)(10) | $_____ |
| Affidavits & Acknowledgments CPLR § 8009 | $_____ |
| Serving Copy Summons & Complaint CPLR § 8011(h)(1), 8301 (d) | $_____ |
| Request for Judicial Intervention | $ 95 |
| Note of Issue CPLR § 8020(a) | $ 30 |
| Paid Referee's Report CPLR § 8301 (a)(12) | $_____ |
| Transcripts and Filing CPLR § 8021 | $ 250 |
| Certified Copies of Papers § 8301(a)(4) | $_____ |
| Satisfaction Piece CPLR § 5020(a), 8021 | $_____ |
| Certified Copy of Judgment CPLR § 8021 | $_____ |
| Postage CPLR § 8301(a)(12) | $_____ |
| Jury Fee CPLR § 8020 (c) | $ 65 |
| Stenographers' Fees CPLR § 8002, 8301 | $ 250 |
| Sheriff's Fees on Execution CPLR § 8011, 8012 | $_____ |
| Sheriff's Fees, Attachment, Arrest, etc. CPLR § 8011 | $_____ |
| Paid Printing Cases CPLR § 8301(a)(6) | $_____ |
| Clerk's Fees, Court of Appeals § 8301(a)(12) | $_____ |
| Paid Copies of Papers § 8016 (a)(4) | $_____ |
| Motion Expenses CPLR § 8301(b) | $_____ |
| Fees for Publication CPLR § 8301 (a)(3) | $_____ |
| Serving Subpoena CPLR § 8011(h), 8301 (d) | $_____ |
| Paid for Search CPLR § 8301(a)(10) | $_____ |
| Referee's Report | $_____ |
| Attendance of Witnesses FEE CPLR § 8001(a)(b)(c), 8301 (a)(1) | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $ 690.00 |

KINGS COUNTY CLERK
2014 AUG -5 PM 4:08
FILED

Printed: 8/20/2014

## ATTORNEY'S AFFIRMATION

STATE OF NEW YORK, COUNTY OF KINGS:

The undersigned, an attorney admitted to practice in the courts of this state, affirms, under the penalties of perjury, that she is *of counsel* to the attorney of record for Ella Burbacki in the above entitled action; that the foregoing disbursements have been or will necessarily be made or incurred in this action and are reasonable in amount and that each of the persons named as witnesses, attended as such witness on the trial, hearing or examination before trial herein the number of days set opposite their names; that each of said persons resided the number of miles set opposite their names, from the place of said trial, hearing or examination; and each of said persons, as such witness as aforesaid necessarily traveled the number of miles so set opposite their names, in traveling to, and the same distance in returning from the place of trial, hearing or examination; and that copies of documents or papers as charged herein were actually and necessarily obtained for use.

Date: August 5, 2014

Zarina Burbacki, Esq., *of counsel*
Law Offices of Jonathan E. Neuman, Esq.
Attorney for Cross-Claimant
Ella Burbacki

To Whom it may concern

I, Oleg Lukov of 839 Cliffside Avenue, North Woodmere, NY 11581 SS███████
Borrowed $94000(ninety four thousand dollars) on February 1,2008 and promise to
return the loan on May 1,2008. *TO  ELLA  BURBACH*
Interest of $3000(three thousand dollars) had been paid for this period.

*3/20/08*
*OLEG LUKOV*

# EXHIBIT B

IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

FLORIDA BAR ID.  637033

CASE NO.   **13 - 12 5 2 9 CC 2 3**

NE 17th AVENUE CORP
15173 NE 21st AVENUE
NORTH MIAMI BEACH, FL  33162
305-940-9882

VS.     Plaintiff(s)

JUL 17 2013

CLERK CIRCUIT & COUNTY COURTS

LUK FUEL LLC & OLEG LUKOV
and ALL OTHERS in POSSESSION
13439 NE 17th  AVENUE
NORTH MIAMI, FL  33181
        Defendant(s)

PLAINTIFF(S), NE 17th AVENUE CORP,

DEFENDANT(S), LUK FUEL LLC & OLEG LUKOV,
and alleges:

**COMPLAINT FOR
REMOVAL OF TENANT
NON-RESIDENTIAL**

1. This is an action to evict a Tenant from real property in MIAMI-DADE County, Florida and to assert a landlord lien.

2. A copy of the three day notice to the tenant is attached. Here to as Exhibit "A".

3. Plaintiff(s) is the Landlord and Defendant(s) is the Tenant, pursuant to the lease attached as Exhibit "B"or pursuant to an Oral Agreement, in possession of the following described real property in said County which is a dwelling unit:

    13439 NE 17th  AVENUE
    NORTH MIAMI, FL  33181

4. The rent due through 7/16/2013 is $4601, rent is $2300.5 next due on 8/1/2013, and monthly

5. The term of the rental agreement has expired by default in payment of the rent and three days notice in writing requiring the payment of such rent or the possession of the premises has been duly served but Defendant(s) refuses to do either.

6. Plaintiff has incurred attorney's fees in the prosecution of this action and is entitled to recover them pursuant to the attached lease and Fla. Stat. 57.105 for lack of judiciable issue.

    WHEREFORE, Plaintiff(s) demands judgment for possession of the property and items subject to landlord lien, costs and attorney fees.

Sheleen G. Khan
12555 Biscayne Blvd # 442  Landlord/Tenant Dept. .
North Miami, FL  33181
VOICE 305-944-1313
FAX   305-944-1320
Prime Email: sgkhan@tenantevictions.com
Secondary Email: sgklaw@gmail.com

By: _Sheleen G. Khan_

Sheleen G. Khan, Attorney for Plaintiff

# EXHIBIT C

# THREE DAY NOTICE- COMMERCIAL

TO: Luk Fuel LLC, Oleg Lukov, and all others in possession: and all others in possession:

ADDRESS: 13439 NE 17th Avenue, North Miami, FL 33181
PURSUANT TO SECTION 83.20(2), FLORIDA STATUTES,
YOU ARE HEREBY NOTIFIED THAT YOU ARE INDEBTED TO the owner of the above property, of which you are a COMMERCIAL tenant, IN THE AMOUNT OF: $ 4601.00

| | | |
|---|---|---|
| Current rent which was due on | July, 1, 2013 | $ 2300.50 |
| Past Due rent: | June 2013 | $ 2300.50 |
| Total Due (exclusive of late charges, bank charges, security deposit, etc) | | $ 4601.00 |

for the above premises located in Miami-Dade County, Florida, now occupied by you on a month to month tenancy. The landlord demands payment in full at the landlord address listed below, or possession of the premises within three days (excluding Saturdays, Sundays, and legal holidays) from the date of delivery of this notice, on or before the:

**11th day of JULY  2013**
Pay rent or vacate premises by this date

---

I hereby certify that a copy of this notice has been furnished to the above named tenant(s) on July 8th , 2013 by
(Date this three day notice served upon tenant)
personal delivery
posting in a conspicuous place on the premises as tenant was absent from the above named residence:


Signed by person delivering/posting

---

Landlord name: NE 17th Avenue Corp
(as it appears on the lease)

Address: 15173 NE 21st AVENUE, NORTH MIAMI BEACH, FL 33162

Phone:  305.940.9882

**Ripoff Report** | Complaints Reviews Scams Lawsuits Frauds Reported. File your review. Consumers educating consumers.™

By consumers, for consumers...

Don't let them get away with it.® Let the truth be known!™



...Let Your Voice Be Heard!

Tune in Saturdays 11.00am AZ Time to KFNX 1100

Home    Help       Register to File a Report    Login

Total Visits since 1998: 8,820,000,000    Estimated money Consumers saved since 1998: $15,449,000,000.68    Reports filed: 1,987,164



FILE A REPORT   Update a Report   Latest Reports   Consumer Resources   Consumers Say Thank You   Legal Directory   **Corporate Advocacy**

- Ripoff Report protects consumers first amendment right to free speech

Review Latest Reports    Advanced Search    Browse Categories

Series 3   Buy Now ▶

Report: #1164654

# Complaint Review: LUKFUEL

Related Reports

LukFuel deceptive liars scumbags greedy smartass fort lauderdale Florida

LUKFUEL Selling contaminate fuel Ft. Lauderdale Florida

Ripoff Reports


David Lynn Lynd Company, Lynd World, Lynd RIPOFF REPORT WARNS OF PERCEIVED QUESTIONABLE CONTENT ((REDACTED)) San Antonio Texas


Car Monkeys Stay away form fraudulent Car Monkeys Wyckoff New Jersey

Aurum Aurum Blackmails Me! Nationwide


Liam massaquie owner of Kasalli clothing Kasalli Clothing aboriginal , Fashion , kanati.co , Liam Massaquie Waterloo , Ontario , Canada Internet


Advicars Jaime Penate The company promised that I would get paid 50 dollars per month and also bonuses never saw a dime , I was working on corporate level...

**Submitted:** Thu, July 24, 2014    **Updated:** Thu, July 24, 2014
**Reported By:** Rick — hallandale beach Florida

LUKFUEL
2019 sw 20th st
Ft. Lauderdale, Florida
USA

**Phone:** 3054323487
**Web:** www.lukfuel.com
**Category:** Boat Marinas



## LUKFUEL Selling contaminate fuel Ft. Lauderdale Florida

### *UPDATE Employee: 100% False Report

☐ 0   G+1 Recommend this on Google   Tweet 0

REBUTTAL BOX™   Respond to this Report!

| Add Rebuttal to this Report | Arbitrate & Set Record Straight |
| File New Report | Repair Your Reputation |

I just wanted to warn boat owner to stay away from LUKFUEL I hired this company because there office is at the Lauderdale Marina I purchase 2000 galons of Diesel for a year old 52 ft Azimut a day later I started having engine problems I had to have it look up by a mechanic they did a fuel analisys and it turned out that the problem was the fuel that they sold me I was extremely contaminated I had to pump out the fuel from my Yatch and sell it for a fraction of the money I paid for it and after $11000 I'm taking them to court please BEWARE OF LUKFUELI just wanted to warn

← Is this
**Ripoff Report**
About you?

**Ripoff Report**
A business' first
line of defense
**on the Internet.**

If your business is


Crest 3DWhite


**Verified Business Directory**
Ripoff Report verified ✓
...businesses you can trust!
**See It Now**


LOANMART AUTO TITLE LOANS
► Get $2,500 - $50,000
► No Pre-Payment Penalties
► Get Your Cash, Keep Your Car
Same Day Cash SEVEN DAYS A WEEK
CALL TODAY




LEARN HOW TO BUY AND INVEST IN GOLD AND SILVER TODAY GET YOUR
Get It Now »
CLEAR

# EXHIBIT D


MaxVue Eye
They charged
me for a
product
supposedly a
Free trial that I
never even
received. They charged me initially
4.95 and then 85.95 also
charged...


Advocare Jaime
Penate JP
Advocare is the
biggest scam
on the internet,
they promised
50$ per month
to install the board and never got
a dime, even at...


The Talaton
Group
REVIEW: The
Talaton Groups
team dedicated
to the entire Client Experience;
are confident in standard
operating procedures for
premium...



LeadsToCompany Leads To
Company | Your brand Manager
100% Fraud Company - Fraud
Employees - Kolkatta Nokithwate



Kensroe
Corgi's Aka
Kensington
Corgi's aka BK
Blue Heelers
Burt, Kerosene
Corgi's My deaf
dog New Braunfels Internet, texas

View past featured reports

Ripoff Report in the media


Ripoff Report on
CBS 19


Ripoff Report on
CBS 19 - Global
Marketing Alliance


Ripoff Report on
ABC 15 - Smart
Shopper

Ripoff Report - Girls
Gone Wild

Ripoff Report on
Fox 11 - Car Repair

See more videos

boat owner to stay away from LUKFUEL I hired this company because there office is at the Lauderdale Marina I purchase 2000 galons of Diesel for a year old 52 ft Azimut a day later I started having engine problems I had to have it look up by a mechanic they did a fuel analisys and it turned out that the problem was the fuel that they sold me I was extremely contaminated I had to pump out the fuel from my Yatch and sell it for a fraction of the money I paid for it and after $11000 I'm taking them to court please BEWARE OF LUKFUEL

Ads by ZINC



willing to make a commitment to customer satisfaction
Click here now.,

Does your business have a bad reputation?
Fix it the right way.
Corporate Advocacy Program™

SEO Reputation
Management at its best!

This report was posted on Ripoff Report on 07/24/2014 09:53 AM and is a permanent record located here: http://www.ripoffreport.com/r/LUKFUEL/Ft-Lauderdale-Florida-33315/LUKFUEL-Selling-contaminate-fuel-Ft-Lauderdale-Florida-1164654. The posting time indicated is Arizona local time. Arizona does not observe daylight savings so the post time may be Mountain or Pacific depending on the time of year.

Ripoff Report has an exclusive license to this report. It may not be copied without the written permission of Ripoff Report.

**Click Here to read other Ripoff Reports on LUKFUEL**

### Search for additional reports
If you would like to see more Rip-off Reports on this company/individual, search here:

LUKFUEL    | Search |   Search Tips

## Report & Rebuttal
**Respond to this report!**    **Also a victim?**    **Repair Your Reputation!**

| File a Rebuttal |   | File a Report |   | Get Started |

### Arbitrate
**Remove Reports?**
No! Better yet! Arbitrate to set the record straight!

REBUTTALS & REPLIES:

## Updates & Rebuttals

| 0 | 1 | 0 |
| --- | --- | --- |
| Author | Consumer | Employee/Owner |

#### #1 UPDATE Employee

# 100% False Report

**AUTHOR: Eli Fennell - ()**
SUBMITTED: Monday, July 28, 2014

The accusations made by this reviewer are 100% False. LukFuel sells only the highest quality of fuel, and we have never sold contaminated fuel to anyone, for any reason. The reviewer claims to have purchased 2000-gallons of diesel fuel for a 52' Azimut, a boat which we have no record of fueling, and which only holds 1800-liters (~400-gallons) of fuel.

The reviewer also claims to be taking LukFuel to court, but we have received no legal documents from this allegedly dissatisfied customer. Our own lawyers are currently seeking the identity of the individual who filed this report as well as a similar review elsewhere, and we will pursue all necessary legal action to clear our name. Since we have no record of this customer or their boat, we believe this is

most likely the work a competitor trying to harm our business. If this reviewer claims to have any real evidence that he was ever our customer, we will gladly consider any evidence they may produce, though we are absolutely confident that no such evidence exists and that we have never sold any fuel to this individual.

LukFuel stands behind the quality of our fuel and service 100%. We have worked very hard to build a good reputation in our industry and will not permit anonymous slander to compromise this. Should anyone wish to contact us about this or any other matters related to our business or products, we urge them to contact Mr. Oleg Lukov at (305) 432-3487 or email info@lukfuel.com.



**Respond to this report!**  [ File a Rebuttal ]

## Report & Rebuttal

**Respond to this report!**    **Also a victim?**    **Repair Your Reputation!**

[ File a Rebuttal ]    [ File a Report ]    [ Get Started ]

## Arbitrate

**Remove Reports?**
No! Better yet! Arbitrate to set the record straight!



**Rip-off Report**

| Home | File a Report | Consumer Resources | Search | Link to Ripoff Report | Customer Support for Technical Issues | General Questions and Suggestions |

| Privacy Policy | Terms of Service | FAQ | About Us | Why Ripoff Report will not release author information! | Go to Mobile Version of Ripoff Report |

| Thank You Emails! | Corporate Advocacy Program: How to repair your business reputation. | Ed Magedson - Ripoff Report Founder |

| Want to sue Ripoff Report? | Donate to our Efforts | BadBusinessBureau.com | Media Requests | Government Requests | Legal Requests |

**Ripoff Report**    Copyright © 1998-2015, Ripoff Report. All rights reserved.

1       UNITED STATES BANKRUPTCY COURT
        SOUTHERN DISTRICT OF FLORIDA
2         FORT LAUDERDALE DIVISION

3            CASE NO. 16-14989-RBR
             Chapter 7

4

In Re:

5

OLEG LUKOV,

6

        Debtor.

7    _____

8

9

10

11

12

13

14                    Dearr Perdigon
                      One Datran Center, Suite 1701
15                    9100 South Dadeland Boulevard
                      Miami, Florida  33156
16                    Thursday, July 7th, 2016
                      10:20 A.M.

17

18

19

20        SWORN STATEMENT OF EILEEN MANNO-CABALLERO

21        Taken before Sylvia Evans, Notary Public for the

22   State of Florida at Large.

23

24

25

**EXHIBIT E**

1

2

3                    A P P E A R A N C E S

4        GARY W. POLLACK, ESQ. and
         LYUDMILA KOGAN, ESQ.
5        (Via Telephone)
         Pollack, Pollack & Kogan, LLC
6        44 West Flagler Street
         Suite 2050
7        Miami, Florida  33130
         On behalf of Ella Burbacki.
8
         CRAIG R. DEARR, ESQ.
9        Dearr Perdigon
         One Datran Center, Suite 1701
10       9100 South Dadeland Boulevard
         Miami, Florida  33156
11       On behalf of Witness.

12

13

14

15                        I N D E X

16
Witness                                              Page

17
EILEEN MANNO-CABALLERO                  Direct.  .  . 3
18

19

20                      E X H I B I T

21
22  Exhibit                                          Page

23    No. 1    Miscellaneous Documents              14

24

25

1     Thereupon,

2                          EILEEN MANNO-CABALLERO

3     was called as a Witness and having been duly sworn, was

4     examined and testified as follows:

5                          DIRECT EXAMINATION

6     BY MR. POLLACK:

7          Q.      Would you state your name for the record, please.

8          A.      Eileen Manno-Caballero.

9          Q.      And Eileen, what do you do for a living, for

10    business?

11         A.      I am essentially a property manager for

12    buildings, for warehousing.

13         Q.      Do you work for a particular corporation?

14         A.      I'm an officer of Northeast 17th Avenue

15    Corporation, yes, and I am involved in the management of those

16    warehouses.

17         Q.      And is that the company that owns the warehouses

18    you were just saying that you are the property manager for?

19         A.      It is one of, yes.

20         Q.      There are multiple?

21         A.      Yes.

22         Q.      The one I think we are focusing on today is

23    Northeast 17th Avenue Corporation.

24         A.      Yes.

25         Q.      And it appears, from the Division of Corporations

1  of Florida, that you are the registered agent.  Does that

2  sound correct?

3       A.     Yes.

4       Q.     And you are also a director?

5       A.     Yes.

6       Q.     Any other officership or directorship of the

7  corporation?  In other words, are you the president, vice

8  president, has anything changed since --

9       A.     I guess I would have to look it up.  I don't

10  remember.

11       Q.     If you don't remember, that's fine.  And any time

12  that I ask you a question, feel free to say you don't

13  remember.

14       A.     Uh huh.

15       Q.     Is Northeast 17th Avenue Corporation also the

16  name of an address for a building?  Is there a building on

17  17th Avenue?

18       A.     It's a building, yes.  It's a corporation that

19  owns a building, I guess is how you would say it.

20       Q.     What does the address 13439 Northeast 17th Avenue

21  represent?

22       A.     I'm assuming that's one of the addresses within

23  the addresses for that building.  There's, I think,

24  twenty-three.  I'm not positive though.

25       Q.     So there are multiple addresses in this building

1  on 17th Avenue?

2        A.      Yes.   They're all warehouses.

3        Q.      Okay.   Thank you.

4                Did you ever have a lease with a company named

5  Luk Fuel?

6        A.      Yes.

7        Q.      And when I say you, I'm just going to consider

8  you -- if you believe this is correct -- the corporate

9  representative, for your testimony today.   Is that okay?

10        A.      Yes.

11        Q.      So Luk Fuel signed a lease with 17th Avenue

12  Corporation?

13        A.      Yes, there is one.

14        Q.      Now, we didn't subpoena you today and we didn't

15  ask you to bring documents here today.   Did you get a chance

16  to look at the old lease?

17        A.      I did.   I looked at it when I spoke to your

18  colleague.

19        Q.      That's Luda Kogan, who is listening on the phone.

20        A.      Uh huh.

21        Q.      Do you recall who had signed the lease on behalf

22  of Luk Fuel, LLC?

23        A.      No, I don't recall who signed it.   I have some

24  memory -- which I might be wrong -- that it was the son-in-law

25  of the person.

1      Q.      Does this name ring a bell, Barry Itzkowitz

2  (phonetically)?

3      A.      It doesn't off the top of my head, no.

4      Q.      Do you remember what the rent was?

5      A.      No.

6      Q.      Monthly?

7      A.      No, not off the top of my head.

8      Q.      Do you have any approximation what the rent was?

9      A.      I can look.

10     Q.      Certainly feel free to refresh your recollection

11  at any time.  If anything helps you, I'd appreciate it.

12     A.      The rent was twenty-one fifty.

13     Q.      And if you're looking at the lease, can you just

14  look to see who signed it, if that name Barry Itzkowitz

15  appears on the lease?

16     A.      Paul King.

17     Q.      Paul King?

18     A.      Uh huh.

19     Q.      Any other names on there?

20     A.      No -- well, mine.

21     Q.      Paul King.  And did you ever meet this person

22  Paul King, if you remember?

23     A.      I mean if he signed it, I'm assuming I did.  But

24  I don't remember meeting him, no.

25     Q.      And does it say Paul Michael King?

```
 1        A.      It says Paul M. King.

 2        Q.      Did you ever meet a person named Barry Itzkowitz

 3   in regards to Luk Fuel, LLC?

 4        A.      I don't remember meeting him.

 5        Q.      Did you ever meet Oleg Lukov?

 6        A.      Yes.

 7        Q.      I will get back to him in a second.  I'm just

 8   going to try to go through some people.  So Oleg you met.

 9        A.      Uh huh.

10        Q.      And what is the year or the time that this lease

11   was supposed to run?

12        A.      December 1st, 2011, to December 31st, 2012.

13        Q.      Did you ever meet Oleg Lukov's wife, Angela?

14        A.      No, not that I know of.

15        Q.      Did you ever meet any of his children, Monique

16   Lukov?

17        A.      I don't recall meeting her.

18        Q.      Or Ariel Lukov?

19        A.      Is that a "her"?  I don't recall meeting her or

20   him.

21        Q.      I think it's a "her."

22        A.      Okay.

23        Q.      I have it next to daughters, so I'm thinking it's

24   a "her."

25                Did you ever meet a son of Oleg Lukov?
```

1       A.      I vaguely recall a boy, that he had a boy, but I
2  don't recall meeting him honestly.  I don't remember a name or
3  anything.
4       Q.      Tell me under what circumstances, if you can
5  recall, when you first met Oleg Lukov.
6       A.      I don't.  He must have -- we keep signs on the
7  building with a phone number to call for rent.  So he must
8  have approached us regarding renting a space.  And I don't
9  know how he approached us.  It could have been from the sign.
10  I don't remember anything about it.  I don't recall him --
11  you know, I don't recall the scenario.
12       Q.      Did you ever see what was in the warehouse space,
13  what they kept there?
14       A.      He had a fuel truck, I believe.
15       Q.      A fuel truck or trucks?
16       A.      I don't know if I ever even saw them.  I remember
17  him saying that he had fuel trucks but I don't recall if I saw
18  them or it or whatever.
19       Q.      Did you ever meet him face to face?
20       A.      Yes.
21       Q.      Approximately how many times did you meet him
22  face to face?  Numerous or just a few?
23       A.      No, just a couple, a few, yeah.  And I don't
24  recall.  I mean I might have run into him when I was at the
25  building or -- I really don't --

1     Q.     And he is the person you remember in regards to

2   this lease on behalf of Luk Fuel, is that accurate?

3     A.     He's the person I spoke to, yes.  He was the

4   person that I guess we had -- we talked with, yes.

5     Q.     Do you recall any content of any conversation you

6   ever had with him?

7     A.     No, honestly, I don't.  I mean --

8     Q.     Did you have any particular impression of what

9   his relationship was to Luk Fuel?

10     A.     I thought he was running it.

11     Q.     And do you have any recollection of why you

12   thought that?

13     A.     Because he was the person that we dealt with.

14     Q.     Do you know if he, if Oleg was the one -- if

15   there even were negotiations, I don't know if there was or

16   not.  Do you know if he was the person who negotiated the

17   terms of the lease?

18     A.     I honestly don't remember.

19     Q.     Are your lease terms usually negotiated or just

20   usually, "Here's the lease.  Sign it"?  Or is it a mixture?

21     A.     It depends on the person.  It depends on the

22   person and some people, you know, they chop it up and some

23   people do nothing.  From the looks of this, it doesn't look

24   like anything was changed.  But I don't recall any discussion.

25     Q.     Did you ever hear of a company named Nautical

1  Ventures?

2       A.      No.

3       Q.      Did you ever hear of or meet a person named Jeff

4  Garcia?

5       A.      No.

6       Q.      A person named Roger Moore?

7       A.      No.

8       Q.      And I assume that's not the actor that used to

9  play James Bond.  I think it's someone else.  That kind of

10 dates me.

11               Did you believe that Oleg Lukov owned Luk Fuel?

12       A.      I remember something about a son-in-law.

13 Something about a son-in-law was the -- was on the company.  I

14 did not know exactly what the structure was or stock shares or

15 whatever.  And I had no reason to really ask a lot of

16 questions so I didn't ask.

17       Q.      Is it fair to say that your only conversations

18 with him were about the lease and about issues regarding the

19 lease?  Does that sound correct?

20       A.      Yes.  I don't usually -- I mean if I would have

21 socialized with him, I think I would remember more about him.

22 And I think anything was probably about the lease or related

23 to paying rent, that's it.

24       Q.      And did that create the impression in you that

25 this fellow, Oleg Lukov, owned the company?

1      A.      I didn't really know who owned the company, per

2  se, but -- you know, I don't know how the company was

3  structured but he was the person that was managing it for all

4  respects that -- or my impression was he was managing it.

5      Q.      And you didn't --

6      A.      Or he was the one we would call if we needed an

7  answer.  That was my impression.

8      Q.      So you don't know one way or the other if he

9  owned the company?

10      A.      No, I don't.

11      Q.      At some point, Luk Fuel stopped paying you rent,

12  does that sound correct?

13      A.      I think more than once but -- I think it was.

14      Q.      So at least once and maybe more than once?

15      A.      Yes.  I don't think he was a good payor, if I

16  remember correctly, or a timely payor.

17      Q.      And the lease was a year lease, from what you had

18  described?

19      A.      Thirteen months, it says.

20              And that's another thing.  I don't even remember

21  why it would be thirteen months.  That's unusual for us.

22      Q.      At some point, you -- and when I say you, I mean

23  Northeast 17th Avenue Corporation, filed a Complaint for

24  removal of the tenant, does that sound correct?

25      A.      Uh huh, yes.

```
 1        Q.      And someone served a Three-Day Notice on Luk Fuel
 2   and Oleg Lukov, does that sound familiar?
 3        A.      Yes, it would have been either myself or my
 4   brother.
 5        Q.      Let me just show you this packet.  It's really
 6   nothing major but it's -- and your attorney, Mr. Dearr, is
 7   very familiar with it.  This is just a docket sheet, it's very
 8   short.  It looks like there wasn't a lot done besides filing
 9   the Complaint.  And then we'll discuss this.  It was dismissed
10   in 2014.  And that's the Complaint apparently.
11        A.      Uh huh.
12        Q.      And you used someone named Sheleen Khan, K-H-A-N,
13   to file the Complaint, correct?
14        A.      Yeah.  Well, we use one company and whoever their
15   attorney is at the time.  We just use a company that does this
16   sort of business.  They do just evictions.  And we were not
17   probably looking for -- we typically don't sue for money, we
18   just sue for the space back.
19        Q.      That's what this looks like.  It looks like a
20   suit to get the space back.
21                And then this is the Three-Day Notice I was
22   saying.  Does that sound correct?
23        A.      Yes, and I'm the one that brought it so --
24        Q.      And now, you notice that on both the lawsuit and
25   the Three-Day Notice, you say it's to Luk Fuel, LLC, and you
```

1    put Oleg Lukov.

2        A.       Uh huh.

3        Q.       Now, do you recall why you also specifically

4    named Oleg Lukov?

5        A.       Because the company that we use to do evictions

6    always makes us, whatever person that we are talking to, they

7    always tell us to include that person.  Or if we know of any

8    other names, to include those names in the thing.

9        Q.       Does this sound correct, that they always want

10   you to provide them with the name of the contact person over

11   at the tenant's place of business or the person you assume is

12   the owner or manager?  Does that sound accurate as to what

13   they want?

14       A.       Yeah, I guess.  It's just so that in the event

15   that that person, I guess, would stand up and say, "No, it's

16   me," then we don't have to go back and evict them as a person.

17       Q.       And you didn't give them any other names besides

18   Oleg Lukov, correct?

19       A.       No.

20       Q.       I mean I'm correct, yes?

21       A.       No, we did not, obviously.  We only gave them

22   that.

23       Q.       It was a double negative.  It's my fault.  I just

24   want to make it clear.

25                Let's make this a Composite Exhibit One.

1          (Exhibit Number One was marked for

2     identification.)

3          MR. POLLACK:

4     Q.     And from this stamp, it looks like this was filed

5  in 2013, this eviction suit.  Does that seem right to you?

6     A.     Uh huh.

7     Q.     Were they not paying rent?  Were they still in

8  the premises and not paying rent through 2012?

9     A.     2012 -- they moved in -- oh, it was in 2013?

10     Q.     Well, I don't know.  I only can see that this is

11  when it's stamped that it's filed.  I don't know if he's in.

12  And I'm just asking you for your recall.

13     A.     Well, my lease says he was there until 2012.  I

14  don't know.  I would have to -- I don't know.  Current rent

15  which was due on July 1st, 2013.  So maybe he was there more

16  than a year, I guess.

17     Q.     Do you recall him possibly staying as a

18  month-to-month tenant after the lease expired?

19     A.     Yeah, a lot of people -- yeah, I'm sure he did.

20  That's not uncommon for us.

21          But I -- I mean honestly, I'm surprised because I

22  don't think I thought he was there more than a year.  I don't

23  think he was there that long.  I don't remember him being

24  there that long.

25     Q.     On the docket sheet, it has this entry --

1    A.      Maybe these dates are wrong.

2    Q.      -- on March 5th, 2014.  So now we're all the way

3 into 2014 on the court docket.  And it says Order of Dismissal

4 and it has parenthesis F.W.O.P., which in lawyer's slang, it's

5 called F.W.O.P., which means that the case -- nothing happened

6 on the case for a year and the Court dismissed it.

7    A.      Uh huh.

8    Q.      Do you remember ever having a discussion to

9 settle the lawsuit with Mr. Lukov whereby he would move out or

10 something?

11    A.      Honestly, these are not like to settle.  If they

12 pay their rent and we decide to accept rent from a person, if

13 we feel that they're -- and this is just a general statement,

14 this is not speaking of him -- and we decide to accept it and

15 then it's a worthwhile risk on our part, then we'll take the

16 rent and just drop it.  I do not know why that was not

17 dropped.  I don't know if he never paid.  I don't remember,

18 honestly.

19    Q.      Do you remember that at some point he vacated the

20 premises?

21    A.      Yes, I do.  I remember -- the only thing I do

22 remember about Luk Fuel leaving was the last check that we got

23 from them, when they gave us the check -- and I don't know how

24 we got the check -- they stopped payment on it the same day.

25    Q.      Which brings up another question.  Do you

1   remember if Oleg Lukov signed the checks that you received?

2       A.      No, I don't remember who signed the checks.

3       Q.      Do you remember the methodology of payment?  And

4   what I mean by that is, when they did pay, was it by check?

5       A.      Yes, it had to be, because that's the only really

6   way we take payment.

7       Q.      Would you say that you're the person most

8   knowledgeable at Northeast 17th Avenue Corporation about this

9   lease, I mean as opposed to anyone else?

10      A.      Yes.

11      Q.      Did you ever negotiate or discuss issues about

12  the lease with anyone else at Luk Fuel besides Oleg Lukov?

13      A.      I don't remember.

14      Q.      Is your only recollection of the person that you

15  would deal with issues regarding the lease or payment about

16  the lease was Oleg Lukov?  Is that the only one you remember?

17      A.      Yes, that's the only person I remember dealing

18  with.  And I remember there was somebody else involved, you

19  know, I remember vaguely something about a son-in-law.  That

20  was it.

21      Q.      But you don't remember how the son-in-law fit in?

22  You just remember vaguely that there was a son-in-law?

23      A.      Yes, that there was some reason that the

24  son-in-law was on the lease, if he was the son-in-law.  I

25  don't even know the relationship.

1       Q.      Would you be able to describe Oleg Lukov?  Do you

2  remember what he looked like?

3       A.      Probably if I saw a picture of him, I would be

4  able to pick him out of a crowd, but not really.  I think he

5  was a little shorter than me but honestly, I don't remember

6  him.

7       Q.      I guess the point would be if he was either

8  standing in front of you or you saw a picture of him, do you

9  think you would be able to remember him?

10      A.      I think I could, yeah.

11      Q.      Do you ever remember -- and I don't even know if

12 you do this -- calling him or sending him a letter that, "Your

13 rent is late," or "What's going on?  Why aren't you paying

14 your rent on time?"  Do you remember anything along those

15 lines in a discussion with him?

16      A.      I don't.  But obviously, he must have been due so

17 -- I don't recall, honestly.

18      Q.      Are you the person that does that sort of thing?

19      A.      Yes, if it were for money and they were very late

20 and it was a problem, yes, I would be the one that would deal

21 with him.

22              (Discussion off the record.)

23              MS. KOGAN:

24      Q.      Eileen, why not name Paul Michael King in the

25 Complaint if he was the individual on the lease?

1          A.        We didn't deal with Paul Michael King, we were

2    dealing with Oleg.

3          Q.        And when you rent to tenants, are there any

4    documents they have to give you relating to their business

5    before signing the lease?

6          A.        We typically look up on Sunbiz their corporation

7    or their entity and we typically look for appropriate people

8    that are listed on Sunbiz to sign.  I mean that's just part of

9    the process.  Whether, you know -- I mean I don't recall if

10   this Paul King was a principal or not but we usually look for

11   somebody that's a principal to sign.

12         Q.        But typically, you don't ask for any kind of

13   other documentation like licenses or registrations for the

14   trucks or anything like that?

15         A.        I don't know if we got a license for Mr. King or

16   not.  Typically, no, we don't typically ask for licenses.

17   Sometimes we get personal information but we do a stamp on the

18   lease and we fill it out on the lease.  And in this instance,

19   it doesn't look like we did.

20         Q.        Did you ever have any issues with Oleg or the

21   company, Luk Fuel, besides non-payment of rent?

22         A.        Not that I recall.

23         Q.        And you recall a son-in-law but you don't recall

24   the son-in-law's name, is that correct?

25         A.        I don't recall meeting a son-in-law.  I recall

1   something about the lease being signed by a son-in-law.

2              (Discussion off the record.)

3              MR. POLLACK:

4        Q.    Are you aware or were you ever aware of the

5   history of Luk Fuel or Oleg Lukov?

6        A.    Yes.

7        Q.    How did you become aware of the history?

8        A.    When he cancelled his check or -- when he

9   cancelled his check, I Googled him.

10       Q.    And what did you find when you Googled him?

11       A.    There was a federal lawsuit against him in New

12   York, something he did in New York.  And it said he was

13   involved -- and it was an article that said he was involved

14   with a crime family in New York.  Because I thought it was odd

15   for somebody to cancel their check the day they wrote their

16   check.

17       Q.    And when you say "cancelled the check" --

18       A.    Stopped payment on it.

19       Q.    He stopped payment on it?

20       A.    I don't know if he did.  Whoever did.  Somebody

21   stopped payment on the check.  And they moved out.

22       Q.    At some point, but you had to file a lawsuit

23   apparently, it looks like?

24       A.    No, I don't know if they moved out because of the

25   lawsuit.

1   Q.  But I mean they didn't move out before the

2 lawsuit because you wouldn't have had to file the lawsuit.

3 That's just logical.

4   A.  I don't know.  These dates don't make sense to me

5 because I don't recall him being here that long.  That would

6 have been a couple years.  I really don't recall him being

7 that long of a tenant but he may have been.  I don't know.

8 I'd have to go back and figure it out.  Maybe look at rent

9 roll or something.

10   Q.  Can you think of any reason if he was already

11 gone, why you would file or have someone file an eviction

12 action?

13   A.  No.  No.  So he must have been there.  I'm

14 assuming he was there.  But I just -- honestly, it seems like

15 he was there a very long time.  That's a year and a half.

16 Longer than I thought he was there, in other words.

17   Q.  But the truth is, you just don't recall --

18   A.  No, I don't.

19   Q.  -- what happened at that point?

20   A.  No.  I do remember the stop payment on the check.

21   Q.  And Googling him after you got the stop payment

22 on the check?

23   A.  Yes, because I thought it was a very strange

24 thing to do.

25   Q.  Has anyone offered you anything in exchange for

1    your testimony today?

2         A.    No.

3         Q.    Has anyone threatened you in any way to force you

4    to testify today?

5         A.    No.

6         Q.    Is everything you've said today the truth?

7         A.    Yes.

8              MR. POLLACK:  All right.

9              MS. KOGAN:

10        Q.    I have one last question.

11              Eileen, when was the last time that you spoke to

12   Oleg Lukov or any representative on his behalf?

13        A.    I don't remember.  I honestly don't.

14              MR. POLLACK:  You have the right to read this

15        when it's typed up.  If you want to read it, I can send

16        it over to Mr. Dearr.

17              MR. DEARR:  That would be good.

18              MR. POLLACK:  She'll read.

19              (Thereupon, formalities having not been waived,

20         the sworn statement was concluded at 10:50 a.m.)

21

22

23

24                            _____
                              EILEEN MANNO-CABALLERO

25

```
 1                    July 12th, 2016

 2   FROM:          SYLVIA EVANS COURT REPORTING, INC.
                    770 PONCE DE LEON BOULEVARD
 3                  SUITE 301
                    CORAL GABLES, FLORIDA  33134
 4                  PHONE:  (305) 445-5503

 5   TO:            EILEEN MANNO-CABALLERO
                    c/o CRAIG R. DEARR, ESQ.
 6                  Dearr Perdigon
                    One Datran Center, Suite 1701
 7                  9100 South Dadeland Boulevard
                    Miami, Florida  33156
 8
     RE:            Deposition of Yourself
 9
     CASE:          In Re:  Oleg Lukov
10
     CASE #: 16-14989-RBR
11
     Dear Ms. Manno-Caballero:
12
                    Your sworn statement taken for use in the
13   above-styled action on the 7th day of July, 2016, has been
     transcribed.
14
                    You may arrange to read and sign the transcript
15   by calling Sylvia Evans Court Reporting, Inc., at (305)
     445-5503.
16
                    If you have not made such arrangements by July
17   26th, 2016, said transcript will be filed without further
     notice.
18

19
                              Very truly yours,
20

21

22

23                  SYLVIA EVANS

24

25
```

```
 1                      CERTIFICATE

 2

 3   STATE OF FLORIDA   )

 4   COUNTY OF DADE     )

 5

 6          I, SYLVIA EVANS, Shorthand Reporter and Notary

 7   Public for the State of Florida at Large, certify that I was

 8   authorized to and did stenographically report the sworn

 9   statement of EILEEN MANNO-CABALLERO; that a review of the

10   transcript was requested; and that the transcript is a true

11   and correct record of the testimony given.

12          I further certify that EILEEN MANNO-CABALLERO

13   personally appeared before me and was duly sworn.

14          I further certify that I am not a relative,

15   employee, attorney, or counsel of any of the parties, nor am I

16   a relative or employee of any of the parties' attorney or

17   counsel connected with the action, nor am I financially

18   interested in the action.

19          Witness my hand and seal this  12th  day of

20   July, 2016.

21

22

23                              _____
                                SYLVIA EVANS
24

25
```

NOTARY PUBLIC
SYLVIA EVANS
MY COMMISSION # FF242130
EXPIRES: June 26, 2019
STATE OF FLORIDA

SYLVIA EVANS COURT REPORTING, INC.
770 Ponce De Leon Boulevard, Suite 301
Coral Gables, Florida  33134
(305) 445-5503

15-21320

STATE OF _FLA_

COUNTY OF _Miami Dade_

PERSONALLY came and appeared before me, the undersigned Notary, the within named Ariel Lukov, who is a resident of Miami Dade County, State of Florida, and makes this his/her statement and General Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of his/her knowledge:

I Ariel Lukov residing At. 2070 NE 121 RD N, Miami FL 33181

Contribute $2,500.00 monthly towards household expenses and rent for the residence that I share with my family at.

2070 NE 121 RD N. Miami Fl 33181.

DATED this the _9_ day of _Sept_ , 20_15_



Signature of Affiant

SWORN to subscribed before me, this _9_ day _Sept_ , 20_15_

NOTARY PUBLIC

NANCY GOLDRING
MY COMMISSION # EE 865780
EXPIRES: February 15, 2017
Bonded Thru Budget Notary Services

My Commission Expires:

_____

**EXHIBIT F**

15 - 21320

STATE OF _Florida_

COUNTY OF _Broward_

PERSONALLY came and appeared before me, the undersigned Notary, the within named Monique Lukov, who is a resident of Miami Dade County, State of Florida, and makes this his/her statement and General Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of his/her knowledge:

I Monique Lukov residing At. 2070 NE 121 RD N, Miami FL 33181

Contribute $5,000.00 monthly towards household expenses and rent for the residence that I share with my family at.

2070 NE 121 RD N. Miami Fl 33181.

DATED this the 9 day of _September_, 20 15

_____
Signature of Affiant

SWORN to subscribed before me, this 9 day _September_, 20 15

_____
NOTARY PUBLIC

My Commission Expires:

02 - 71 - 18